United States District Court
Southern District of Texas
**ENTERED**
February 25, 2021
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *Plaintiff*, | § § § | |
| v. | § § | CRIMINAL ACTION NO. 4:99-CR-373-1 |
| YUNG-MING CHEN, *Defendant*. | § § § | |

### ORDER

Yung-Ming Chen ("Chen"), a federal prison inmate, asks the Court to grant his Emergency Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) modifying his 327-month prison term to a time-served sentence. (Doc. No. 209). The Government responded in opposition on the merits. (Doc. No. 210). Chen moved under 18 U.S.C. § 3582(c)(1)(A), relying primarily on the threat of infection from the COVID-19 virus and his alleged increased susceptibility to the consequences of that virus because of his age and medical conditions.

Based on careful consideration of the briefs, the record, and the applicable law, the Court denies Chen's motion for compassionate release.[1]

The reasons for this ruling are set out below.

### I.  Background

On June 30, 1999, a federal grand jury charged Chen and two co-defendants in a single count indictment alleging violations of 8 U.S.C. § 1324 for illegally trafficking humans in the United States. (Doc. No. 1). This indictment was later superseded to include multiple counts of illegal human trafficking and hostage-taking. (Doc. No. 8).

---

[1] The Court finds Chen has exhausted his remedies and therefore rules here on the merits.

1

On September 30, 1999, Chen pleaded guilty, pursuant to a written plea agreement, to Count 8S: hostage-taking in violation of 18 U.S.C. § 1203. As part of the plea agreement, Chen partially waived his right to appeal. The Government, in exchange for Chen's plea, agreed to recommend to the Court that it dismiss the remaining counts of the superseding indictment.

The description of Chen's illegal conduct, to which he agreed, was summarized at his rearraignment as follows:

> [O]n or about June 2nd of this year, Miss Fu Mei Chen, a 31-year-old national from China, a person whom the defendant knew was in the United States unlawfully, was being held by the defendant at the Roadrunner Inn, a motel located at 6865 Southwest Freeway in Houston, within the Southern District of Texas.
>
> Specifically, there were two rooms that were rented, rooms 296 and 297 in that motel. Miss Fu Mei Chen was in room 297. The defendant and others were responsible for smuggling Miss Fu Mei Chen into the United States from her homeland in China on a previous occasion.
>
> Miss Fu Mei Chen had not paid her full smuggling fees. She was not free to leave the custody of the defendant and others until her smuggling fees were paid in full.
>
> During the early morning hours of that same date of June 2nd, 1999, Miss Fu Mei Chen was moved around at the direction of the defendant and other smugglers. She and another smuggled alien were ultimately moved to the Roadrunner Inn specifically because the defendant was nervous about other smugglers discovering her whereabouts as well as another Chinese national alien.
>
> She was moved, along with a male alien, to the Roadrunner Inn and while arrangements were being made to transfer this woman, Fu Mei Chen, to the custody of other smugglers, she escaped from the second story bathroom by jumping or falling out of room 297 while attempting to escape and, in fact, successfully escaping.
>
> These facts, Your Honor, would be presented in court through the testimony of a number of other witnesses, including the smuggled aliens themselves, other smugglers, Houston Police Officers and Detectives that initially made the scene, and FBI and INS Agents that followed up on that investigation.

(Doc. No. 138, 18–19).

The Magistrate Judge, in reporting on Chen's later filed Motion to Vacate, described Chen's post-plea proceedings as follows:

> A Pre-sentence Investigation Report ("PSR") was prepared, to which both Chen and the United States filed written objections. A final PSR was filed on February 11, 2000, which included a two level decrease from the sentencing guidelines for Acceptance of Responsibility, and which recommended the Total Offense Level be 38. With no 5K1.1 motion for a downward departure from the United States and one level added during sentencing for holding a hostage at least seven days, Chen was sentenced to the maximum 327 months imprisonment to be followed by a five year term of supervised release. Also, the court imposed a fine of $100,000, a special assessment charge of $100 and restitution of $98,662.00. Judgment was entered on February 17, 2000.
>
> On February 18, 2000, Chen filed a *pro se* notice of appeal, claiming that (1) the district court's appointment of an interpreter, who was not qualified in Taiwan-Mandarin Chinese, violated his right to due process; (2) the district court erred in accepting his guilty plea pursuant to Fed.R.Crim.P. 11(c)(1); (3) the statute he was accused of offending, 18 U.S.C. § 1203 [hostage taking], is unconstitutional; (4) the district court's sentencing enhancements under U.S.S.G. §§ 2A4.1(b)(2), 2A4.1(4)(B), 2A4.1(b)(5), and 3B1.1(b) are unconstitutional in light of *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and (5) the district court violated Fed.R.Crim.P. 32 by not making explicit findings as to his ability to pay the court's imposed fine. Chen also filed, on February 18, 2000, a § 2255 Motion to Vacate, Set Aside or Correct Sentence. Additionally, Chen requested that a "conflict free" attorney be appointed to represent him. After being appointed a new attorney, on March 30, 2000, Chen filed a motion to dismiss without prejudice his § 2255 Motion to Vacate, Set Aside, or Correct Sentence, which was granted by the district court. On February 26, 2001, the Fifth Circuit dismissed Chen's appeal as "frivolous." On April 30, 2001, Chen filed a petition for writ of certiorari with the United States Supreme Court, which was denied on October 15, 2001.

(Doc. No. 165, 3–4) (citations omitted).

On October 11, 2002, Chen filed the § 2255 Motion to Vacate, Set Aside or Correct Sentence. (Doc. No. 158). The United States filed a Response to Chen's Motion for Relief under 28 U.S.C. § 2255 and Motion to Dismiss. (Doc. No. 164). The Magistrate Judge recommended that the Motion to Vacate be denied and that the Government's Motion to Dismiss be granted. (Doc. No. 165 at 14). The Court adopted the recommendation and denied the § 2255 motion. (Doc. No. 175).

3

## II. Chen's Current Motion

Chen's motion is predicated on 18 U.S.C. § 3582(c)(1)(A) and is based upon two primary points. Chen's two overlapping arguments are based on the changes made to the compassionate relief provisions by the First Step Act and the presence of COVID-19 in the prison system. Initially, he claims generally that prisoners cannot be protected from COVID-19 in prison populations, and secondly that he specifically is more at risk.

### A. General Prison Conditions

Chen first argues generally that the combination of COVID-19 and prison is deadly and that he should be released due to this risk.

The Government first argues briefly that it is making prisons as safe as possible as fast as possible.

> COVID-19 is a dangerous illness that has caused hundreds of thousands of deaths in the United States in a short time. The Bureau of Prisons (BOP), recognizing the pandemic's effect on the people in their facilities, has taken aggressive action. The BOP continues to implement a modified operations plan to help mitigate the spread of COVID-19. The BOP's efforts have been successful at CI Rivers, Defendant's current facility, which houses 498 inmates. From the beginning of the pandemic, only 68 inmates contracted COVID, and none died. Currently, 65 inmates have recovered, and only 3 are still positive.
>
> Now that COVID-19 vaccines are available, the BOP is working with the CDC and Federal Government's COVID-19 Vaccine/Therapeutics Operation (formerly known as Operation Warp Speed) to receive vaccine doses. To date, the BOP has administered 47,829 vaccine doses. Defendant has not received a COVID-19 vaccine.
>
> The BOP follows Attorney General Barr's directive to review all inmates who have COVID-19 risk factors and determine if they are suitable for home confinement. The BOP has significantly increased offenders' placement in home confinement and currently has 7,635 inmates in the program. Since March 26, 2020, including those who have since completed their sentences, the BOP has placed 21,689 inmates in home confinement. Defendant is not eligible for home confinement because of his active immigration detainer.

(Doc. No. 210, 2–3) (omitting footnotes and attachments).

4

The Court does not find Chen's general argument to be persuasive.

**B.     Chen and COVID-19**

**1.     Chen's Argument**

Next, Chen makes a specific argument based on the COVID-19 pandemic and the increased susceptibility to COVID-19 which incarcerated individuals may face due to the inherent problem of effectuating social distancing. Chen is 59 years old. According to the CDC, 59-year-old individuals, such as Chen, are four times more likely to need hospitalization and twenty-six times more likely to die from COVID-19 than the comparison group of 18-29-year-old individuals.[2] Other than his age, Chen points to several medical conditions that might make him more susceptible to contracting COVID-19 or suffering more severe effects should he contract it. Chen has diabetes, hypertension, high cholesterol, and hepatitis B. Clearly, diabetes and hypertension have been identified as underlying diseases which might increase the severity of COVID-19.[3] The effect of hepatitis B or high cholesterol on COVID-19 has not been confirmed by the CDC.[4]

Given these conditions and based upon the currently published medical literature, there is no doubt that Chen would be at a higher risk of severe illness from COVID-19 than any inmate not suffering from these conditions.

Chen is serving a 327-month sentence. His current projected release date, assuming credit for good time, is in September of 2022. He has an immigration detainer lodged against him because

---

[2] The CDC recently updated its rate ratios table to change the reference group from 18-29-year-old individuals to 5-17-year-old individuals. However, the Court prefers to use the rate ratios compared to 18-29-year-old individuals since no 5-17-year-olds are to be found in the Bureau of Prisons. *See* Centers for Disease Control and Prevention (2021). COVID-19 Hospitalization and Death by Age. https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html
[3] *See* Centers for Disease Control and Prevention (2021). People with Certain Medical Conditions. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html
[4] Chen also alleges that he has a heart condition. (Doc. No. 209 at 1). The Government's brief denotes this as ischemic heart disease. (Doc. No. 210 at 5). This condition has not been described in the pleadings or attachments; consequently, the Court does not address this alleged medical condition.

5

he is not a legal resident of the United States or an American citizen. Given the new administration's recent announcements, there is no way of telling whether that detainer will be enforced. He is currently serving his sentence in the Rivers Correctional Institute in Winton, North Carolina, which has had no COVID-19 deaths and currently has only three inmates with positive COVID-19 tests out of an inmate population of almost 500. (Doc. No. 210 at 2).

### 2. Government's Opposition

The Government concedes that at least two of Chen's medical conditions raise his risk of serious illness or death should he contract the COVID-19 virus. Nevertheless, the Government strenuously opposes his release because of the anti-COVID measures taken by the BOP and maintains the only way to protect the public from the impact of his future crimes is to keep him incarcerated.

> The Government first set out a comprehensive factual summary:
>
> According to the presentence report, FBI agents learned about Defendant's hostage-taking when one of the victims, Fe Mei Chen, fell while attempting to escape from a second-story window at an inn in Houston, Texas. She had used a shower curtain and towels to make a makeshift rope to scale down from the second story. An ambulance rushed her to the hospital, where she needed emergency surgery on her back.
>
> When the FBI interviewed Ms. Chen, they learned that she was a Chinese national who paid a human-smuggling organization to smuggle her into the United States. Her journey began in November or December 1997 when she took a ship from China to Guatemala. The ship had about 200 Chinese males and 13 Chinese females. The ship was stranded for eight days at sea after running out of fuel and food. Ms. Chen first met Defendant when he brought a smaller boat to resupply the larger ship. She identified him as the person responsible for her and the others while they were transported and harbored.
>
> The smuggling organization initially told Ms. Chen that she needed to pay a $15,000 fee, which she believed she could pay through employment in the United States. After she started her journey, someone told her the fee would be $40,000, which she could not pay. She overheard Defendant discussing selling her to a broker in New York because she couldn't afford the increased $40,000 fee.

6

> Ms. Chen made it into the United States on May 31, 1999, and the organization brought her to Houston, Texas, where Defendant met her. On June 1, 1999, Defendant took Ms. Chen to a Sun Suites Motel in Houston. While at the hotel, Defendant told Ms. Chen to come to bed and watch television with him. Ms. Chen told Defendant she did not want to have sex with him, but Defendant told her that he was her boss and forced her onto the bed and removed her pants. Defendant used his penis to make contact with her vagina, only failing to penetrate after she told him she was menstruating.
>
> The presentence report detailed that Ms. Chen had been unable to find work following her escape attempt because of her physical limitations. Her injuries required placing a titanium plate in her back. In the short time between her escape attempt on June 2, 1999, and the revised presentence report issued on February 7, 2000, Ms. Chen incurred $62,807 in hospital expenses and $35,855 in orthopedic expenses. She was afraid she would never earn enough money to follow-up with her medical care and physical rehabilitation.
>
> Ms. Chen was not Defendant's only hostage. He also held Ri-Bioa Yang because his family could not pay the suddenly increased smuggling fee. Mr. Yang's family originally paid $10,000 to smuggle Mr. Yang into the United States. Once Mr. Yang arrived, Defendant told him that he owed another $30,000. When Mr. Yang told Defendant he could not pay that money, Defendant told him that he would sell him to a New York broker. Mr. Yang told FBI agents he was in the room when Defendant sexually assaulted Ms. Chen, but he covered himself in a blanket to avoid seeing the sexual act.
>
> The events that occurred in June 1999 were not Defendant's first foray into alien smuggling. As far back as 1992, a ship registered to Defendant was seized by Guatemalan authorities for transporting 216 Chinese aliens. Guatemalan authorities identified Defendant as the ship's captain. Guatemala lacked the resources to deport the aliens; they released the ship and allowed them to pass through to Mexico. Defendant did not face any punishment for this criminal behavior.

(Doc. No. 210, 8–9) (citations omitted).

> Based upon these facts the Government argues:
>
> Considering the § 3553(a) factors, in this case, the serious nature of Defendant's crime cannot be overstated. First, he took $10,000 to $15,000 from vulnerable people trying to come to the United States. Once they arrived and were even more vulnerable—without family or friends' support—he raised the price by 300%. When they couldn't pay the exorbitant fee, he planned to sell them like property, and told at least one of them that he was going to do just that. He then sexually assaulted one of his hostages in front of the other, stopping short of rape only when his victim claimed to be menstruating.

7

Defendant claims he merits release because, while serious, his conduct "involved neither weapons nor allegations of violence." That is not only false, it shows that Defendant still doesn't appreciate the effect his crime had on his victim, even after serving 20 years in prison. He sexually assaulted a woman after forcibly removing her clothes. His actions led to a desperate escape attempt that left her with permanent injuries. Because of Defendant, Ms. Chen has a titanium plate in her back and faces the prospect of paying for follow-up medical care and therapy.

District Judge Melinda Harmon, who had the benefit of reviewing the presentence report and hearing from both parties, provided the following reasoning when sentencing Defendant to the high-end of the guideline range: "The defendant's actions placed the victim in a life-threatening situation, causing the victim severe mental anguish and unlimited pain and suffering." Defendant will already receive a 60-month reduction because of good-time credit. To further reduce Defendant's sentence to time served is not justified when considering the appropriate § 3553 factors. The Court should deny Defendant's motion.

(Doc. No. 210, 9–10) (citations omitted).

### III. Discussion

Section 3582(c)(1)(A)(ii) requires any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(ii). The policy statement allows a reduction for "extraordinary and compelling reasons," only if the reasons are "consistent with this policy statement." U.S. SENTENCING GUIDELINES MANUAL § 1B1.13(1)(A), (3) (U.S. SENTENCING COMM'N 2018). Application Note 1 explains that "extraordinary and compelling reasons exist under any of the circumstances set forth below." *Id.* § 1B1.13 cmt. n.1. These circumstances are: (a) suffering from a terminal illness or other medical condition "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover"; (b) being at least 65 years old and "experiencing a serious deterioration in physical or mental health because of the aging process" and having "served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less"; (c) the "death or incapacitation of the caregiver of the defendant's minor child or minor children" or the "incapacitation of the defendant's spouse or

8

registered partner when the defendant would be the only available caregiver for the spouse or registered partner"; or (d) "[a]s determined by the Director of the Bureau of Prisons, . . . an extraordinary and compelling reason other than, or in combination with, the [above] reasons." *Id.* § 1B1.13 cmt. n.1. Chen does not fall under subpart (a), nor does he fall under subpart (b), as he is not older than 65. He does not seek relief under subpart (c). Consequently, to qualify for relief under § 3582(c)(1)(A)(ii), he must fall under subpart (d).

Courts differ on whether Application Note 1 remained binding after Congress passed the First Step Act. *Compare United States v. Cantu*, 423 F. Supp. 3d 345, 352 (S.D. Tex. 2019) ("U.S.S.G. § 1B1.13 cmt. n.1(D) no longer describes an appropriate use of sentence-modification provisions and is thus not part of the applicable policy statement binding the Court."), *with United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *3 (10th Cir. Mar. 26, 2020) (the district court did not err by considering § 1B1.13 commentary when determining whether an "extraordinary and compelling reason" existed that warranted a sentence reduction).

Chen contends that his well-being is greatly endangered by the risk of COVID-19 merely because he is incarcerated and because of his COVID-19 comorbidity factors. Chen clearly has at least three factors that arguably enhance his susceptibility and that could complicate his recovery if he contracts the COVID-19 virus. In fact, the Government makes no real attempt to argue to the contrary.

That being said, over the years Chen has been involved in multiple human trafficking schemes. In the one that led to his conviction here, multiple individuals were not only smuggled, but were held for ransom and were targeted to effectively be put in servitude until the ransom was paid. Moreover, he sexually assaulted one of the hostages, which caused her to jump out a window to keep from being raped—a jump that resulted in permanent injuries. This Court's predecessor

9

assessed a just punishment years ago and this Court sees no reason to vary. Most importantly, given the history and characteristics of Chen, the Court finds the need to protect the public and afford adequate deterrence to criminal conduct compels that this Court deny Chen's motion. He has violated this country's immigration laws and federal criminal statutes multiple times and was involved in conduct that resulted in serious injuries to one of his captives.

## IV. Conclusion

The Court denies Chen's Emergency Motion for Compassionate Release (Doc. No. 209) and denies all other pending motions.

SIGNED at Houston, Texas this 24th day of February, 2021.

Andrew S. Hanen
United States District Judge